**William TENNANT, Plaintiff,**

v.

**State of FLORIDA, Florida Department of Law Enforcement, and City of Miami Beach, a political subdivision of the State of Florida, Defendants.**

**No. 98–1043–CIV–GOLD.**

United States District Court, S.D. Florida.

Jan. 13, 2000.

Arthur Tifford, Miami, FL, for plaintiff.

Elizabeth Rodriguez, Peter J. Oppenheimer, Kubicki Draper, Miami, FL, for

the State of Florida and Fla. Dept. of Law Enforcement.

Mark Goldstein, City Attorney's Office, Miami Beach, FL, for the City of Miami Beach.

### ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON THE FEDERAL CIVIL RIGHTS CLAIM AND REMANDING PLAINTIFF'S STATE LAW CLAIMS

GOLD, District Judge.

This action arises out of a series of events surrounding the arrest of plaintiff William Tennant on August 17, 1994. Special Agent Eugenio Figueroa and Special Agent Jesus Rodriguez, acting as law enforcement officers with the Florida Department of Law Enforcement ("FDLE"), obtained a warrant from Marion County to arrest the plaintiff for probation violation. *See* Joint Pretrial Stipulation at 4 Statement of Uncontested Facts ["Facts"]. The FDLE agents requested backup from the Miami Beach Police Department in part because the agents were in plain clothes. The FDLE agents met up with Miami Beach police officers Glenn Hodges and Bruce Songdahl at the Days Inn Hotel, in Miami Beach. The four police officers found Tennant at the bar in the hotel. Agent Figueroa approached Tennant, asked him his name, and told him he was under arrest. Tennant claims that before he was handcuffed, he told the officers he had recently had open heart surgery[1], he pulled down his shirt, showed them his scar, and asked if he could be handcuffed with his hands in front. The officers ignored his request and one of the Miami Beach officers proceeded to search him and then handcuff him with his hands behind his back.

Tennant was escorted out of the bar by the police officers and taken to an unmarked FDLE two door car. At that point, the handcuffs were switched and agent Figueroa's handcuffs were placed on Tennant, again with his hands behind his back. Tennant claims he continued to complain of pain and continued to request that he be handcuffed in front. Tennant was placed in the front seat of the car and seatbelted into place. The two Miami Beach police officers left the scene and Figueroa drove Tennant to the Dade County Jail. Tennant claims Figueroa took a long time to reach the jail, taking a circuitous route and making a lot of rapid turns that made his chest hurt. Tennant claims he complained about his chest hurting.

When they arrived at the Dade County Jail, the jail refused to accept Tennant and directed Figueroa to take him to the emergency room. Tennant was observed and treated by Dr. David Paz. Tennant complained about severe pain in the sternum area of his chest following a "pop" which he felt when he was handcuffed with his hands behind his back. An x-ray confirmed Tennant had suffered a ruptured sternal wire. After being treated by Dr. Paz, Tennant was returned to the FDLE agent and taken back to the jail. Tennant was returned to the emergency room later that evening for more treatment before being returned to the jail again.

Tennant's primary claim against the defendants is for a violation of § 1983 for having a policy or custom of inadequate training on how to handcuff a person who was recovering from cardiac surgery or was disabled. Tennant also complains that the FDLE and Miami Beach Police Department ("MBPD") covered up the fact that he was injured and the officers did not write up the use of force reports and injury to persons reports that the procedures require. The MBPD had no record of Tennant's arrest or of the Miami Beach officers that arrested him. Officer Hodges had no recollection of arresting Tennant.

This case was removed from the Circuit Court of the Eleventh Judicial Circuit of Dade County, Florida based on federal question jurisdiction arising out of plaintiff's § 1983 claim against the defendants.

---

1. Tennant had open heart surgery on May 18, 1994.

Plaintiff has voluntarily withdrawn his claims for false arrest (Count III) and false imprisonment (Count IV) against all the defendants. *See* Plaintiff Response at 2 n. 1. What remains is a federal § 1983 civil rights claim against the defendants (Count I), a state law claim for excessive use of force against the defendants (Count II)[2], and a state law claim for battery against the defendants (Count V). The defendants now move for summary judgment on all counts.[3]

## I. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. Sept.1997). The moving party has the burden to establish the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Tyson Foods, Inc.*, 121 F.3d at 646. Once the moving party has established the absence of a genuine issue of material fact, to which the non-

moving party bears the burden at trial, it is up to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Issues of fact are genuine only if a reasonable jury, considering the evidence presented could find for the nonmoving party. *Anderson*, 477 U.S. at 247–51, 106 S.Ct. at 2510–11. In determining whether to grant summary judgment, the district court must remember that, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* 477 U.S. at 255, 106 S.Ct. at 2513.

## II. Count I—Plaintiff's § 1983 Claim Against State of Florida and the Florida Department of Law Enforcement is Barred by the Eleventh Amendment

### A. Application of the Eleventh Amendment

The Eleventh Amendment to the United States Constitution states: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. The Amendment also equally bars suits against a state commenced by that state's own citizens. *See Edelman v. Jordan*, 415 U.S. 651, 663, 94

---

**2.** Plaintiff's only federal claim was Count I. In writing its motion for summary judgment, the City of Miami Beach apparently thought that Count II (excessive force) was also a federal claim. The amended complaint did not state that it was a federal claim. Additionally, in plaintiff's response, plaintiff states, "The first of Mr. Tennant's state law claims is for excessive use of force, currently denominated as Count II."

**3.** The court's task in evaluating the City of Miami Beach's motion for summary judgment was made much more difficult because of the City's failure to abide by Local Rule 7.5 which requires it to submit a concise statement of material facts to which there is no genuine issue to be tried. The City's one paragraph "Concise Statement of Material Facts" was inadequate, but plaintiff did not object to it. In the interests of deciding the motion on the merits, however, the court did examine the entire record submitted by the parties.

S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana*, 134 U.S. 1, 13–15, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Further, the Amendment bans suits against state officials where the state, in fact, is the real party in interest. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In general, these bans prohibit federal courts from exercising subject matter jurisdiction over private party suits filed against a state or state officials.

■ However, three exceptions to this constitutional bar have been recognized by the Supreme Court. First, individual suits may proceed directly against a state if a state waives its sovereign immunity. *See Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). Second, individual suits against a state also may be adjudicated it Congress, pursuant to a valid exercise of congressional power, abrogates a state's immunity through a clear statement of its intent to abrogate. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Finally, individual suits that seek prospective relief for ongoing violations of federal law also may be levied against state officials. *See Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Plaintiff does not seek prospective relief for any ongoing violations. Additionally, Congress has not abrogated Florida's immunity through § 1983. *See Carr v. City of Florence, Alabama*, 916 F.2d 1521, 1525 (11th Cir.1990) ("Congress has not abrogated Eleventh Amendment immunity in section 1983 cases."); *see also Will v. Michigan*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."). Therefore, only two questions remain: 1) whether the Florida Department of Law Enforcement covered by the State of Florida's immunity, and 2) whether Florida waived its immunity through § 768.28, Florida Statutes.

### B. The FDLE is a State Agency Entitled to Eleventh Amendment Protection

■ Whether the Florida Department of Law Enforcement "is an arm of the state partaking of the state's Eleventh Amendment immunity turns on its function and characteristics as determined by state law." *Sessions v. Rusk State Hospital*, 648 F.2d 1066, 1069 (5th Cir.1981).[4] The Florida Department of law Enforcement is an agency of the state of Florida. Fla. Stat. §§ 20.04, 20.20.[5] The FDLE is therefore covered by the Florida's Eleventh Amendment immunity.

### C. Section 768.28, Florida Statutes, Does Not Waive Florida's Sovereign Immunity

Plaintiff "concedes that the established law as prescribed by the United States Supreme Court is that unless a state consents to being sued a suit by a private party seeking to impose a liability payable from public funds in the state's treasury is foreclosed by the Eleventh Amendment." Plaintiff Response at 22. Plaintiff only argument is that the "language of the Florida Sovereign Immunity Statute codified at, *Florida Statutes*, § 768.28, is sufficiently clear as to render the State of Florida as a 'natural person,' for purposes of suit monetary damages, and, as such, constitutes a waiver of the state's Eleventh

---

4. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

5. *See also* Joint Pretrial Stipulation at 4 Statement of Uncontested Facts ("At all relevant times, the State of Florida was a sovereign state and the FDLE a law enforcement agency of the state.").

Amendment immunity...." *Id.* at 22–23. Plaintiff suggest in footnote seven that his "argument on this point presents a question of first impression to this Court." A review of Eleventh Circuit case law, however, shows that this issue has been adequately dealt with before.

■ In *Schopler v. Bliss,* 903 F.2d 1373, 1379 (11th Cir.1990), the Eleventh Circuit held that a district court erred in interpreting § 768.28 as a statutory waiver of Florida's Eleventh Amendment sovereign immunity. The court noted its previous decisions holding that § 768.28 does not waive Florida's Eleventh Amendment immunity specifically citing *Hamm v. Powell,* 874 F.2d 766, 770 n. 3 (11th Cir.1989) and *Gamble v. Fla. Dept. of Health and Rehabilitative Services,* 779 F.2d 1509 (11th Cir.1986). The court also noted that subsection 768.28(16) (which is now 768.28(17)) expressly "declares the legislature's intention that Florida Statutes not be construed to waive Eleventh Amendment immunity unless they explicitly waive immunity from suit in federal court." *Id.* at 1379. Section 768.28(17) reads as follows:

> No provision of this section, or of any other section of the Florida Statutes, whether read separately or in conjunction with any other provision, shall be construed to waive the immunity of the state or any of its agencies from suit in federal court, as such immunity is guaranteed by the Eleventh Amendment to the Constitution of the United States, unless such waiver is explicitly and definitely stated to be a waiver of the immunity of the state and its agencies from suit in federal court. This subsection shall not be construed to mean that the state has at anytime previously waived, by implication, its immunity, or that of any of its agencies, from suit in federal court through any statute in existence prior to June 24, 1984.

Because plaintiff fails to point to any evidence or legal support that would indicate

the state has consented to be sued in federal court or has in any way waived its immunity, the court hereby dismisses plaintiff's § 1983 claims against the State of Florida and the Florida Department of Law Enforcement. *Will,* 491 U.S. at 71, 109 S.Ct. 2304; *see also Rindley v. Gallagher,* 890 F.Supp. 1540, 1553 (S.D.Fla. 1995) ("[T]he DPR as a state agency is immune from suit under the Eleventh Amendment.").

## III. Count I—Plaintiff's § 1983 Claim Against the City of Miami Beach

### A. Municipal Policy Requirement

■ Plaintiff asserts a § 1983 claim against the City for having a policy or pattern of deliberate indifference in that it failed to train or supervise its officers on how to handcuff disabled arrestees and cardiac patients. *See* Amend. Complaint at ¶¶ 9–10. The Supreme Court has placed strict limitations on municipal liability under § 1983. First, there is no respondeat superior liability making a municipality liable for the wrongful actions of its police officers. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, a municipality may be held liable for the actions of a police officer only when municipal "official policy" causes a constitutional violation. *See id.* at 694–95, 98 S.Ct. 2018. Plaintiff must therefore "identify a municipal 'policy' or 'custom' that caused [has] injury," *Board of County Com'rs v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626. 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018); "It is only when the 'execution of the government's policy or custom ... inflicts the injury' that the municipality may be held liable under § 1983." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

■ Thus, the City is not automatically liable under § 1983 even if it inadequately

trained or supervised its police officers and those officers violated plaintiff's constitutional rights. Instead, the Supreme Court has explained that there are only "limited circumstances" in which an allegation of a failure to train or supervise can be the basis for liability under § 1983. *See City of Canton,* 489 U.S. at 387, 109 S.Ct. 1197. The Supreme Court has instructed that these "limited circumstances" occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights. *Id.* at 389–91, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412; *see also Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1555 (11th Cir.1989); *Brown,* at 402–03, 407–08, 117 S.Ct. at 1388, 1390.

■ Since a municipality rarely will have an express written or oral policy of inadequately training or supervising its employees, the Supreme Court has further explained that a plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a "deliberate indifference" to the rights of its inhabitants, as follows:

> We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. This rule is most consistent with our admonition ... that a municipality can be liable under § 1983 only where its

policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.... "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality—a "policy" as defined by our prior cases—can a city be liable for such a failure under § 1983. *City of Canton,* 489 U.S. at 388–89, 109 S.Ct. 1197 (internal citations omitted).

■ To establish a "deliberate or conscious choice" or such "deliberate indifference," a plaintiff must present some evidence that the municipality knew or should have known of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action. *See Board of County Com'rs v. Brown,* 520 U.S. 397, 401–11, 117 S.Ct. 1382, 1390–91, 137 L.Ed.2d 626 (1997); *Young v. City of Augusta, Georgia,* 59 F.3d 1160, 1171–72 (11th Cir.1995); *Church v. City of Huntsville,* 30 F.3d 1332, 1342–46 (11th Cir.1994); *Wright v. Sheppard,* 919 F.2d 665, 674 (11th Cir.1990); *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1556–57 (11th Cir.1989).[6]

■ The Eleventh Circuit repeatedly has held that without notice of a need to train or supervise in a particular area, a

---

**6.** The Eleventh Circuit in *Gold v. City of Miami,* 151 F.3d 1346, 1351 n. 10 (11th Cir.1998) noted the burden this standard imposes on the plaintiff: "This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability—a result never intended by section 1983. As the Supreme Court has explained, '[t]o adopt lesser standards of fault and causation would open mu-

nicipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in de facto respondeat superior liability on municipalities ....'" (citing *City of Canton,* 109 S.Ct. at 1206); *see*

municipality is not liable as a matter of law for any failure to train and supervise. For example, in *Wright v. Sheppard*, 919 F.2d 665 (11th Cir.1990), the court held that a sheriff's department was not liable for a deputy's acts when "no evidence of a history of widespread prior abuse ... put the sheriff on notice of the need for improved training or supervision." *Id.* at 674. Similarly, in *Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir.1994), the court reversed a district court's preliminary injunction against the City of Huntsville, holding that the plaintiffs were not likely to succeed on the merits of their failure-to-train claim without proof that the City was aware of a prior incident in which constitutional rights were similarly violated. *Id.* at 1342–46. *See also Popham v. City of Talladega*, 908 F.2d 1561, 1564–65 (11th Cir.1990) (finding no liability for failure to train when no pattern of incidents put the City on notice of a need to train). More importantly, in *Brooks v. Scheib*, 813 F.2d 1191 (11th Cir.1987), even though there had been ten citizen complaints about police officer Scheib, the court held that the City did not have any notice of past police misconduct because the plaintiff "never demonstrated that past complaints of police misconduct had any merit." *Id.* at 1193. The court noted, "Indeed, the number of complaints bears no relation to their validity." *Id.*

### B. Plaintiff Presented No Evidence of Prior Incidents

Plaintiff failed to show that the city knew or should have known that its al-

leged "policy" of failing to train or supervise its officers on how to properly handcuff disabled arrestees and arrestees recuperating from cardiac surgery was causing constitutional violations. Specifically, plaintiff has not pointed to a single other incident, aside from his own, where the police were alleged to have injured a disabled person or a person recovering from cardiac surgery by handcuffing them improperly. Richard Barreto, the Chief of the Miami Beach Police Department, states in a sworn affidavit, "[e]xcept for the incident alleged in William Tennant's amended complaint, I do not know of any other disabled arrestee or any arrestee recuperating from cardiac surgery who has been injured or who alleged that he was injured because of being handcuffed by any member of the Miami Beach Police Department." City Mot. for SJ Attached Affidavit at ¶ 7 [Barreto Aff.]. Barreto has worked continuously with the Miami Beach Police Department since October 19, 1970. *See id.* at ¶ 7.

In his response to the City's motion for summary judgment, plaintiff completely fails to argue that the city had any notice [7] of the constitutional violations its "policies" were causing. Plaintiff instead responds with two arguments: 1) the constitutional violations caused by the City's "policies" were a "plainly obvious consequence," and 2) the reason plaintiff could not find any other incidents of injuries to disabled peo-

*also Brown*, at 415–16, 117 S.Ct. at 1394 ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.").

**7.** In *Young v. City of Augusta, Georgia*, 59 F.3d 1160, 1172 (11th Cir.1995), the Eleventh Circuit explained the notice requirement as follows:

> Before it may be said that a municipality has made a deliberate choice among alternative courses of action, its policymakers must have had "actual or constructive notice that the particular omission is substan-

tially certain to result in the violation of the constitutional rights of their citizens." This may be demonstrated in one of two ways. First, the need for a particular type of training may be obvious where jailers face clear constitutional duties in recurrent situations. Alternatively, the need for more or better training may be obvious where a pattern of constitutional violations exists such that the municipality knows or should know that corrective measures are needed.

*Id.* at 1172 (internal citations and parentheticals omitted).

ple or people who have had cardiac operations is because the City did not report these incidents.

### i. No Obvious Need

Plaintiff's first argument is that the need to train and supervise in the area of alternatives to handcuffing behind the back was obvious and the likelihood of constitutional violations was highly predictable so that liability attaches for this single incident. In *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court in dictum left open the possibility that a need to train could be "so obvious," resulting in a City being liable without a pattern of prior constitutional violations. *Id.* at 390, 109 S.Ct. 1197. As an example, the Supreme Court in *City of Canton* referenced the obvious need to train police officers on the constitutional limitations on the use of deadly force, when the city provides the officers with firearms and knows the officers will be required to arrest fleeing felons. Id. at 390 n. 10, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412.

Subsequently, in *Board of County Commissioners v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the Supreme Court characterized the language in *City of Canton* leaving open such a possibility as simply hypothesizing in a narrow range of circumstances that a plaintiff might succeed without showing a pattern of constitutional violations, as follows:

> In leaving open in Canton the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predicta-

ble consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.

*Brown*, at 410–11, 117 S.Ct. at 1391 (emphasis added) (holding isolated incident of sheriff's inadequate screening of deputy did not create such an obvious risk that it alone established the municipality's deliberate indifference to the risk that the deputy would use excessive force). In short, to date, the Supreme Court has given only a hypothetical example of a need to train being "so obvious" without prior constitutional violations: the use of deadly force where firearms are provided to police officers.

*See City of Canton*, 489 U.S. at 390 n. 10, 109 S.Ct. 1197.

■■■■■ In any event, plaintiff's contentions that the police officers were inadequately trained and/or supervised regarding the City's written policies and the alternatives to handcuffing behind the back "fall[ ] far short of the kind of 'obvious' need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city." *City of Canton*, 489 U.S. at 396–97, 109 S.Ct. 1197 (finding no obvious need for police officers to be trained in diagnosing mental illness) (O'Connor, J., concurring in part and dissenting in part); *Young v. City of Augusta, Georgia*, 59 F.3d 1160, 1171–72 (11th Cir.1995) (finding no obvious need to train jail employees "to recognize the need to remove a mentally ill inmate to a hospital or to dispense medication as prescribed"). "Unlike the risk from a particular glaring omission in a training regimen," the risk from these possible imperfections, if any, in the City police officers' training and supervision here "is not obvious in the abstract." *Brown*, at 410–11, 117 S.Ct. at 1391.[8] Finally, other than making the conclusory

---

**8.** Plaintiff presented expert testimony that the need for training and/or supervision should have been obvious to the City and that the

City was deliberately indifferent in not responding. *See* Aff. of Robert T. Lacey, J.D. However, an expert's conclusory testimony

legal assertion that the need to train was "obvious," plaintiff failed to cite to or analogize to any cases which would suggest that the failure to train in this case was "obvious." Indeed, plaintiff's own expert, Robert Lacey, conceded that an arrest of a cardiac operation patient is uncommon; Lacey himself had never arrested or participated in the arrest of someone who had open heart surgery. *See* Lacey Depo. at 29. The court concludes that this case is like *Gold,* where the Eleventh Circuit concluded that the need to train police in the proper response to handcuff complaints is not so obvious that it would support a finding of deliberate indifference without proof of prior incidents. *Gold,* 151 F.3d at 1352.

### ii. The City's Record Keeping

Plaintiff argues that the City's lack of a record of plaintiff's arrest is evidence of poor record-keeping by the City and suggests that other incidents of injuries and circumstances similar to that of the plaintiff are being covered up by the City:

> The integrity of the City's reporting complaints of injury having been so challenged by the particular facts developed in this case so as to allow the Plaintiff to urge that any reference to "this being the first instance of a recent-surgery arrestee making complaint of injuries resulting from excessive force during handcuffing" should be totally disregarded by this Court. This is because the City's MBPD, by failing to report, controls and creates the very "absence of prior incidents" which it urges the Court to consider in its favor. The City's officials can implicitly ratify a custom which resulted in Tennant's injuries."

Pl. Response at 20 n. 4.

Plaintiff, however, overstates the significance of a lack of a report of plaintiff's arrest in this case because the record shows that this was not the City's arrest.

The record shows that the two Miami Beach police officers were called as backup by Florida Department of Law Enforcement agent Figueroa because the FDLE agent was in plainclothes and required backup. FDLE agent Figueroa approached plaintiff first, asked him his name, and told him he was under arrest. *See* Tennant Depo. at 61–62. While this was going on the Miami Beach police officers were standing behind FDLE officers. *See id.* at 62. Plaintiff states that a Miami Beach officer told him to turn around and put his hands on the bar, searched him, took out the contents of his pockets, and began handcuffing him behind his back. *See id.* at 62–63. Plaintiff told the officer not to handcuff him from behind and showed the officer the scar from the operation. *See id.* at 63–64. Plaintiff did not resist being handcuffed. *See id.* at 63. The Miami Beach officers escorted the plaintiff out of the hotel by the arms and when they got to agent Figueroa's car, they switched handcuffs. *See id.* at 54–55. The Miami Beach police officers said their good-byes, left the scene, and had nothing further to do with the plaintiff. *See* Figueroa Depo. at 21–22.

Plaintiff was not struck by anyone and did not have bruises on his body after the incident. *See* Tennant Depo. II at 6. He was never bleeding from his chest at any time during this incident. *See id.* at 7. He requested medical treatment for the first time when FDLE Agent Figueroa arrived with him at the Dade County jail. *See id.* at 9.

Chief Barreto said in his deposition that under the circumstances of this case, the arrest was the FDLE's arrest and the Miami Beach police officers did not have to

does not control the court's legal analysis of whether any need to train and/or supervise was obvious enough to trigger municipal lia-

bility without any evidence of prior incidents putting the municipality on notice of that need. *See Gold,* 151 F.3d at 1352 n. 13.

write an arrest report. *See* Barreto Depo. at 24. The plaintiff was sought by the FDLE, not the City. *See id.* FDLE agent Figueroa said he had a conversation with the Miami Beach police officers where he told them that he had the warrant, he was going to transport the plaintiff, and he would write the arrest report. *See* Figueroa Depo. at 21–22. Figueroa said in his opinion the Miami Beach officers did not have to write a report unless they were required to by their department. *See id.* at 22. Figueroa was the arresting officer. *See id.* at 22. Plaintiff has not presented any evidence to contradict the truthfulness of Chief Barreto's statements or the statements of Figueroa.[9]

 Plaintiff also finds fault with the fact that the Miami Beach officers did not write a use of force report or an injury to persons report. It is fairly obvious that no use of force report was written because no force was used. As described above, plaintiff says he did not resist arrest, was not struck by anyone, and had no bruises on his body. The Miami Beach officers did not write an injury to persons report because they did not know plaintiff was injured while he was with them. The first time plaintiff requested medical attention was when he was at the Dade County Jail with the FDLE agent—the Miami Beach police officers were not involved in plaintiff's transport. Plaintiff also has not shown that the Miami Beach police officers were ever made aware that the plaintiff was taken to the hospital, that they ever spoke to agent Figueroa again, or that policy required that they speak again. Plaintiff therefore fails to raise all infer-

ence of a cover up in this case that would lead to an inference of a widespread cover up that would explain why there have been no reported incidents of injuries to people recovering from cardiac operations or disabled people from improper handcuffing.

## C. The City Did Have a Policy of Training Officers in Proper Handcuffing Techniques

The court addressed the plaintiff's arguments above on the assumption that the City had a policy or custom of not providing any training on handcuffing from the front or handcuffing disabled persons. The Miami Beach Police Department, however, did have a policy relating to the proper method of handcuffing disabled persons. The relevant portion of the policy manual states: "Except when the health, physical condition, or circumstances of arrest dictate otherwise, all arrested persons shall be handcuffed behind their back." MBPD Manual at 3–17–3. Despite the City's clearly stated policy, plaintiff argues that the officers are trained to ignore the policy and only handcuff behind the back. For example, plaintiff claims that Chief Barreto "admitted that the only training MBPD officers receive regarding the handcuffing of arrestee's is to cuff behind the back and that no training is provided as to when not to cuff behind the back...." Plaintiff Resp. at 11. Plaintiff fails to cite to the court where Barreto makes this statement. Upon an exhaustive examination of Barreto's deposition, the court found that Barreto's testimony is that the training officers receive is consistent with the written policy.[10] While Bar-

---

9. Plaintiff does present the affidavit of his expert, Robert Lacey, who says the Miami Beach police officers should have filed a report. The affidavit, however, is insufficient to create a disputed issue. The affidavit merely recites the facts of the case and makes conclusory legal statements without providing any support for the conclusions.

10. Q: What is your knowledge of what your department taught its officers, at least, 1993 forward, meaning, to now concerning the handling of intended arrestee who announces that he's been a recent surgery patient, open heart surgery patient?
 BARRETO: I don't know what the specific curriculum was but my recollection is that we were teaching that the officers had sev-

reto did concede that no training was given regarding the specific situation of arresting a person recovering from cardiac surgery, plaintiff's expert, Robert T. Lacey, states that it would not have been practical to list every possible problem an arrestee could have, such as "broken finger, broken everything." Lacey Depo. at 66. Lacey states that ultimately it is up to the agent to determine whether the arrestee will be handcuffed in the front or the back. *See id.* Additionally, one of the Miami Beach Officers who helped arrest plaintiff, Glenn Hodges, said that in the police academy he was taught "to handcuff people behind their back. If there was something that was an exception to that, then they would go in front of them—you have to use your own judgment whether circumstances are going to warrant it, not handcuffing the person behind their back." Hodges Depo. at 11. Hodges was also aware of the policy manual statement on handcuffing techniques and exceptions. *See id.* at 16–17.

■■■ Based on the existence of a written policy and the uncontradicted testimony of Chief Barreto, the court concludes that municipal liability cannot attach in this case. Even if the Miami Beach Officers did ignore the written policies and the training, without further evidence that the City has adopted an unofficial policy of always handcuffing behind the back, the City cannot be held liable. *See Brown,* 117 S.Ct. at 1389 ("That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably.") (emphasis in the original). Accordingly, the court grants summary judgment in favor of the City as to Count

I, plaintiffs § 1983 claim of municipal liability.

## IV. Plaintiff's State Law Claims Against the State of Florida, the Florida Department of Law Enforcement and the City of Miami Beach

The dismissal of plaintiff's only federal claim against all the defendants leaves only state law claims. As the Eleventh Circuit made clear in *Palmer v. Hospital Authority of Randolph County,* 22 F.3d 1559, 1567 (11th Cir.1994), once a court decides that it has power to exercise supplemental jurisdiction under § 1367(a), then the court should exercise that jurisdiction, unless § 1367(b) or (c) applies to limit the exercise. In this case, § 1367(c) applies because the Court "has dismissed all claims over which it has original jurisdiction;" namely, plaintiff's § 1983 claim against the defendants. While § 1367(c) permits a court to dismiss any state law claims where the court has dismissed all the claims over which it had original jurisdiction, the court also can consider other factors. Where § 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction. *See Palmer,* 22 F.3d at 1569; *Executive Software N. Am. v. United States Dist. Court,* 15 F.3d 1484, 1493 (9th Cir.1994); *New England Co. v. Bank of Gwinnett County,* 891 F.Supp. 1569, 1578 (N.D.Ga.1995); *Fallin v. Mindis Metals, Inc.,* 865 F.Supp. 834, 841 (N.D.Ga.1994).

Resolution of Plaintiffs' state law claims depends on determinations of state law. State courts, not federal courts, should be the final arbiters of state law. *Hardy v. Birmingham Bd. of Educ.,* 954 F.2d 1546, 1553 (11th Cir.1992). When coupled with

---

eral alternatives, and, certainly, one of those is ... they could handcuff him in front. They could order him by a police officer on each side which requires more resources, but if that was the case, then

that's what you'd have to do ... so there were a number of alternatives. They can leg restrain him. A number of different things.
Barreto Depo. at 32.

the court's discretion to exercise supplemental jurisdiction under § 1367(c), the court finds that the state law claims remaining in this action are best resolved by the Florida courts. This is especially true here where the court is dismissing Plaintiffs' federal law claim prior to trial. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (dismissal of state law claims strongly encouraged when federal law claims are dismissed prior to trial); *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988) ("When federal law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."); *Eubanks v. Gerwen,* 40 F.3d 1157 (11th Cir.1994) (remanding case to district court to dismiss plaintiff's state law claims where court had granted summary judgment on plaintiff's federal law claims). The court finds that judicial economy, fairness, convenience, and comity dictate having these state law claims decided by the state courts. Accordingly, plaintiff's remaining state law claims are dismissed without prejudice and remanded to the state court.

**WHEREFORE, IT IS ORDERED THAT:**

1) City of Miami Beach's motion for summary judgment (DE # 84) is GRANTED as to Count I, plaintiff's § 1983 claim;

2) State of Florida and Florida Department of Law Enforcement's motion for summary judgment (DE # 97) is GRANTED as to Count I, plaintiff's § 1983 claim;

3) Plaintiff's voluntarily withdrawn claims for false arrest (Count III) and false imprisonment (Count IV) against all the defendants are DISMISSED WITH PREJUDICE;

4) The court shall refrain from exercising supplemental jurisdiction over plaintiff's remaining state law claims;

5) Plaintiff's remaining state law claims are DISMISSED WITHOUT PREJUDICE;

6) This case is hereby REMANDED to the Circuit Court for the Eleventh Judicial Circuit of Dade County, Florida.

7) All pending motions as of the date of this order, including DE # 's 84, 135, and 138, are DENIED as MOOT; and

8) This case is hereby CLOSED.